No. 41.—WILLIAM, (a slave) plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

[1.] For the *definition* of offences committed by slaves and free persons of color, recourse must be had to the Penal Code of 1833, and not to the Criminal Code of the Common Law.

Murder, in Muscogee Superior Court.    Tried before Judge WORRELL, December Term, 1854.

Bill (a slave) was indicted for the murder of Cæsar, another slave.    The evidence showed that both of them were employed about a livery stable in Columbus.    Bill was just grown and smaller than Cæsar, who weighed 188 pounds.    Bob, another slave, and Cæsar, had a scuffle, (the morning of the homicide,) and Bill "*devilled*" Cæsar about Bob's scratching his neck.    The latter begged him to let him alone, and then got mad.    They all went to carry horses to the trough to water.    *Bill* had his hand in his pocket on his knife—dared Cæsar "to make a riffle towards him, and he would cut his heart out of him."    Cæsar would not hit him, and then Bill said he would give him first lick, and see if Cæsar would "*mash him up.*"    Bill left his horse, and went round and slapped Cæsar, with his hand, on the shoulder.    Caesar showed no fight.    Bill then stabbed him.    This was the substance of the testimony.

Counsel for defendant requested the Court to charge, "That if the Jury should believe that defendant believed that

William (a slave) *vs.* The State.

he was without friends amongst the negroes at the stable, and that Cæsar and the balance of the negroes were associated to oppress and harrass him; and if, in this connection, Bill believed that it was the intention of Cæsar to "mash him up;" and if Bill acted on this belief, under these circumstances, without malice aforethought, then it was manslaughter and not murder." The Court refused so to charge, and defendant's Counsel excepted.

The Court charged the Jury, that the definition of manslaughter, as laid down in the Penal Code of 1833, was applicable in the trial of a slave or free person of color. To this charge defendant's Counsel excepted.

These are the only errors assigned.

McDOUGALD and JAMES JOHNSON, for plaintiff in error.

RAMSEY, representing Sol. Gen. BROWN, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] A reversal is claimed in this case, upon two grounds —1st. The refusal of the Court to charge as requested; and 2dly. In reading to the Jury the definitions of murder and manslaughter from the Penal Code of 1833, as the law of the case.

1. Counsel for the prisoner do not manifest much confidence in the first ground. It was dwelt on but slightly in the argument. We award to the able Counsel credit for his candor in this matter; a professional virtue for which he deserves commendation, in all of his efforts before this Court.

The Judge was requested to charge the Jury, that if they should believe that the accused felt that he was without friends among the negroes at the livery stable, and that Cæsar, the boy slain, and the rest of them, were combined to harass and oppress him; and in the prosecution of this hostile

or evil intent, it was the design of the deceased "to mash Bill up," (to use the cant phrase of the witness,) and that the prisoner acted upon this conviction and without malice aforethought, then his offence was manslaughter, and not murder.

Had the evidence authorized this charge, it would have constituted a good defence to the prosecution, at least so far as to mitigate the crime from murder to manslaughter; and that the state of circumstances assumed to be true, for the purposes of the charge, may have existed in point of fact, is not improbable. The disparity in the age, size and manhood of the parties, make it unlikely that the younger and weaker should have commenced the assault in the manner in which Bill is represented by the testimony to have done, had there not been some lurking cause, not fully developed, goading him on. His expression, too, that he had long wanted to kill Bill, a damned rogue, and that he would not rest until he had done so, manifests some secret grief not disclosed by the proof.

But not one of the facts hypothetically put in the request, are to be found in the record. It is not shown that Bill had no friends among the hands at the stable. Neither did it appear that they had clubbed together to worry or otherwise maltreat him. There is not only the entire absence of all such evidence, but, on the contrary, the only teasing seems to have been by the defendant.

Bob and Cæsar had had a scuffle, or *tussle*, as they called it, the morning of the day on which the homicide was committed, in which Cæsar received a scratch on the neck. It bled, and Bill jeered him more than once upon the mishap. Indeed, the proof establishes, that from the commencement to the fatal termination of this unfortunate affair, Bill, by words as well as by acts, was the aggressor. Conscious that he was armed with a deadly weapon, he not only bantered Cæsar for a fight, but when he failed to provoke him, to bring on the rencontre, Bill stepped up to him, and putting his left hand on Cæsar's shoulder, he almost simultaneously, as Cæsar turned, plunged his knife into his breast.

William (a slave) *vs.* The State.

We trust the reality is not so bad as the testimony makes it.

Upon this ground, we are clear that the judgment below should be affirmed.

2. The next and main ground is, whether the definition of murder and manslaughter, as contained in the Penal Code of 1833, is the law by which this slave should have been tried?

We concur with Counsel, that the Code of 1833, as well as those which preceded it, apply to free white citizens, and not to slaves, unless such parts thereof as are specially made so. Where shall we go, then, to get the definition of offences which may be committed in this State by slaves and free persons of color? None of the Statutes passed, specifying the crimes which may be committed by this portion of our population, give any definition of those crimes. Neither the Acts of 1811, 1816 or 1821, define the crimes of murder or manslaughter, when committed by a slave or free person of color.

It is maintained that we must resort to the Common Law for this purpose. Wherefore? The Criminal Code of the Common Law is no more applicable to slaves than the Penal Code of 1833. And our Adopting Statute of 1784, in introducing the Criminal Code of the Common Law into this State, was never supposed to have extended it to slaves. They were a class *sui generis*, and have always been so treated by our legislation. We commenced, in 1770, to make provision for slaves, and the Provincial Act of that year is exceedingly comprehensive. We have been adding to it ever since.

It is no doubt true, that both before and since the Adopting Statute, we resorted to the Common Law for the definition of offences committed by slaves; and this practice continued until we adopted a Penal Code of our own. From that time, the uniform practice has been, to look to the existing Code, for the time being, for our definitions. If the Penal Codes have superseded and repealed the Criminal Code of the Common Law for our white population, *in all respects*, it has effected the same for the blacks, so far as to change the definitions of offences which may be committed by them.

William (a slave) *vs.* The State.

Such we believe to be the general understanding through-out the State; and no reason occurs to us, founded either in law or policy, why a different practice should be established; for we repel the imputation, that our's is a bloody Code, when compared with that of England. We hold the very reverse to be true, and hope to vindicate it from this reproach, origi-nating in misconception, when some of our recent decisions are submitted to the profession and the public. Be this as it may, we cannot doubt but that we are correct in the conclu-sion at which we have arrived upon this important point.

In answer to the inquiry, whether or not perjury, forgery, counterfeiting, &c. as defined by our Code, may be committed by a slave or free person of color, we reply, unquestionably, they may be. In the Act of 1816, (*Prince,* 792,) after enu-merating particular offences, will be found this general pro-vision : "All other offences committed by a slave or free per-son of color, either against persons or property, or against another slave or person of color, shall be punished at the dis-cretion of the Court before whom such slave or person of color shall be tried; such Court having in view the principles of humanity in passing sentence; and in no case shall the same extend to life or limb."

Suppose a negro had the intelligence to counterfeit bank bills—why may he not be punished, under this law, for the offence of counterfeiting, as defined in the Code? And so, if he commit perjury in testifying against another slave. We do not mean to say, that a slave, in Georgia, is capable of committing every crime contained in the Code. Most of them he may, and be punished, under the discretionary power vested in the Inferior Court, by the Act of 1816.